## 22632. RUTLAND *v.* THE STATE.

DECIDED JANUARY 25, 1933. REHEARING DENIED FEBRUARY 17, 1933.

*McDonald & McDonald, L. H. Glenn, C. L. Buss, Hal Lawson,* for plaintiff in error.

*T. Hoyt Davis, solicitor-general,* contra.

GUERRY, J. G. Q. Rutland was indicted in Wilcox superior court for the homicide of Cecil Faircloth. He was convicted of voluntary manslaughter, and in his bill of exceptions assigns error on the overruling of his motion for a new trial.

The killing occurred about 7:30 o'clock at night on Saturday, March 12, 1932. The evidence discloses that Rutland and Faircloth were next-door neighbors in the little town of Seville in Wilcox county. Rutland operated a store in the town and Faircloth was a customer of his and traded with Rutland on the day of the homicide, and had Rutland to cash a little order that he had. The deceased was shown to have been heavily intoxicated at the time of the difficulty, and it was developed by several witnesses that he had been drinking and was seen on different occasions to throw away two pint-bottles which had been emptied by him and those drinking with him. He stated to a State's witness a few minutes before the killing, "I am getting sorter drunk."

As a part of the events culminating in the killing, it was shown that without provocation and without warning he walked up to one Lester Morrow, a complete stranger who was standing by the side of Rutland's store talking to Gene and Paul Powell, and struck him and knocked him down and got on top of him. During the struggle Lester Morrow cut Faircloth over the eye and in the back. The Powell boys pulled him off Morrow and told Morrow to run, which he did. The deceased walked to the corner of Rutland's store and was leaning up against it, and seemed to be bleeding quite profusely from the cut over the eye. The Powell boys, who are 17 and 19 years old respectively, called on William Shirah, who was standing in front of Rutland's store and who was a clerk employed by Rutland in said store, and asked Shirah to speak to Faircloth, to see what he could do with him. Shirah said nothing and did nothing, but Faircloth immediately assaulted Shirah and struck him with his fist. Shirah retreated into the store and Faircloth picked up an empty crate which had contained 48 bottles, and went into the store behind Shirah. The defendant Rutland had heard

the disturbances on the outside, and when Shirah came in he asked what the trouble was, and Shirah told him that Faircloth had hit him. Rutland had walked toward the front of the store, but was behind the counter, and when Shirah came in Faircloth followed him and without provocation immediately struck at Rutland across the counter with the bottle crate, but did not hit him, and he then attempted to come behind the counter to strike Rutland. Rutland did nothing and said nothing, except to tell Faircloth to leave the store. He did not at that time exhibit any anger toward Faircloth, nor display any weapon, nor make any effort, nor attempt any action of any kind. Shirah testified that Rutland was in the habit of keeping a pistol about midway of the store, near the money drawer. Rutland, in his statement, said that he was in the back part of the store and heard the disturbance out in front and did not know who it was, and that he walked to his "treasury box" and picked up his pistol and stuck it in his side-pocket and and walked on toward the front of the store, behind the counter. This was before Shirah or Faircloth entered the store. While these events were transpiring in Rutland's store, the Powell boys went to Beckham's store, which was 118 feet north of Rutland's store. Both stores were on the same street, facing east, and there was a vacant lot between them. When the Powell boys reached Beckham's store they asked Mr. Beckham (who was a relative by marriage of Faircloth's) to see if he could not do something with Faircloth, that "he was fighting and going to hurt somebody or get hurt." Mr. Beckham replied, "I can't go. I can't leave my place of business. I can't do anything with him." After Faircloth left Rutland's store Shirah went to the back door and fastened it, stating that he was afraid Faircloth would try to come in that way. Rutland walked out the front door, and no other witness testified as to seeing either Rutland or Faircloth until Rutland was seen running toward Beckham's store with Faircloth in pursuit. Rutland's statement shows that he was going to see Beckham and that Faircloth came running toward him from the dark and made a lunge at him, and he dodged and Faircloth fell in the ditch next to the sidewalk, and that Rutland ran out into the middle of the street and took the pistol in his hand. Faircloth continued going toward Rutland, and Rutland, with the pistol in his hand in front of him and with his back towards Faircloth, commenced running towards Beckham's store. Several wit-

nesses testified to the same effect. There was an electric light on the awning in front of Beckham's store which made it easy for the men to be seen. Beckham's store was some twenty inches higher han the sidewalk and Rutland was running, and when he entered the door he stumbled and fell into the store, and Faircloth ran in and grabbed him. Beckham, the chief witness for the State, testified that he and a witness, Conner, were in the back of his, Beckham's, store, and that when Rutland came into the store he was hollering and crying "Come here Beckham! Come here Beckham!" and that the pistol was held by Rutland as though he was trying to keep somebody from taking it away from him, and that when Faircloth came in he jumped on Rutland's back. He stated that the manner of entering the store by Rutland and Faircloth, and the fact that the pistol was pointed toward him and Conner, who were in the back of the store, caused them both to become excited and run out the back-door, and that he ran around the back of the store and then heard a fall, and turned and walked back into the door; that Rutland was hollering all the time, but he did not understand what he was saying; that when he had come back into the store, about six feet inside the store, the defendant and the deceased were down in the aisle of the store, and it seemed that the deceased had had his arm around Rutland's neck and was reaching with his other hand for Rutland's hand; that Rutland cried out, "I am going to shoot him, I am going to shoot him," three times, like that, and the pistol fired; that when the shot was fired he did not see Faircloth's right hand and could not say that Faircloth was not trying to get that pistol with his right hand from Rutland. The undisputed testimony both of the State's witness and of the defendant's shows that Faircloth was pursuing Rutland and ran into Beckham's store; that he jumped on Rutland's back, and that they were both down on the floor; that Rutland called loudly for help a number of times and his cries continued all during the struggle, and that Faircloth was silent. There were several witnesses who testified that the deceased was trying to take Rutland's pistol. Other witnesses testified that Rutland said, "I am going to shoot, I am going to shoot, I can't stand this," and fired one time. There is some conflict in the evidence as to the exact position of the defendant and the deceased at the time the shot was actually fired, some stating that Rutland reached the pistol around under his left arm and shot the deceased

while he was on his back, and others stating that he was on one knee at the time he fired the shot. Another witness, Adams, testified that he was at Pass's filling station, which is diagonally across the street and 130 feet distant from the front door of Beckham's store, and that at the time the shot was fired a heavy set man was standing up and he saw the flash of the pistol, which was about three or three and a half feet from the floor; that he did not see the deceased when the pistol was fired, by reason of the fact that he was looking into the door diagonally. This witness testified that he heard Rutland hollering and crying out before the shooting occurred.

The defendant and the deceased were friends, so far as the record discloses. The deceased traded with the defendant a short time before the killing. The deceased was shown to have consumed a quantity of whisky immediately preceding the trouble; and his unprovoked attack on Morrow, a total stranger, his unprovoked assault on Shirah, and his unprovoked assault on Rutland in Rutland's store, all being a part of a practically continuous transaction leading up to the fatal encounter, showed that he could not have been otherwise than crazy drunk. Shirah did not see Rutland get his pistol, and Rutland's statement was to the effect that he had it in his pocket before he even knew who was fighting and before Faircloth came into his store. He certainly made no effort to use it when he was attacked without cause by the deceased with the bottle crate in his own place of business. He immediately went towards Beckham's store to let Beckham, a relative of Faircloth's, know that the boy was in trouble. In the language of the defendant's statement, "I didn't figure he [Faircloth] could see me, didn't figure anything about it. I said I'll go down and tell Mr. Beckham about this boy, he has gotten in trouble someway." While the defendant was on his way to Beckham's store the deceased made another unprovoked attack upon him on the street. Although the defendant had his pistol he declined to use it, and ran from the deceased and called to Beckham for help. Every witness who detailed his cries for help shows conclusively that they were the cries of a man in terrible distress. The deceased caught him in Beckham's store, got on his back, had him on the floor, and was trying to take his pistol. He continued his cries for help and when none came he cried, "I am going to shoot him, I am going to shoot him. I can't stand this."

Under the facts as above outlined it would seem to this court that the conclusion that the defendant acted under the fears of a reasonable man in trying to prevent the deceased from gaining possession of the pistol and committing a felony on the defendant is just as reasonable as that he shot as a result of a sudden heat of passion and without any mixture of deliberation whatever. "Where the facts in evidence and all reasonable deductions therefrom present two theories, one of guilt and the other consistent with innocence, the justice and humanity of the law compel the acceptance of the theory which is consistent with innocence." *Davis* v. *State,* 13 *Ga. App.* 142 (78 S. E. 866). The court erred in overruling the motion for a new trial.

*Judgment reversed. Broyles, C. J., and McIntyre, J., concur.*

ON MOTION FOR REHEARING.

Upon consideration of the motion for a rehearing, the headnote to this case was substituted for the one originally written.